# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 31, 2022

Lyle W. Cayce
Clerk

No. 19-10874

BARBARA HARRISON, *by her next friend and guardian*, MARGUERITE HARRISON,

*Plaintiff—Appellee*,

*versus*

CECILE ERWIN YOUNG, *in her official capacity as the Executive Commissioner, Texas Health and Human Services Commission*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-01116

Before KING, JONES, and COSTA, *Circuit Judges*.

GREGG COSTA, *Circuit Judge*:

This dispute is about whether Texas must provide around-the-clock nursing services to a disabled individual even though the expense of doing so exceeds the cost cap in the state's Medicaid program.  Plaintiff contends that the Americans with Disabilities Act and Rehabilitation Act require this service because the alternative of institutionalization would amount to discrimination.  The district court issued a preliminary injunction requiring Texas to provide the nursing services.  Although we conclude that the district

No. 19-10874

court has jurisdiction to hear this suit under *Ex parte Young*, we vacate the injunction and remand for the district court to make additional findings.

I

Barbara Harrison suffers from cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and substantial intellectual disabilities. Because of those conditions, Harrison needs intensive medical care. The Texas Health and Human Service Commission (HHSC)—of which defendant Cecile Erin Young is now Commissioner[1]—pays for Harrison to receive that care from Berry Family Services, a community-based care center near Dallas.

Until Harrison's health deteriorated in early 2018, her care was funded through a Medicaid program that states can adopt to provide home- and community-based care for persons with disabilities who would otherwise require institutionalization. 42 U.S.C. § 1396n(c)(1). This is called a "waiver" program because approval of such a plan by the federal Centers for Medicare and Medicaid waives a number of Medicaid requirements, such as the requirements that a plan be available throughout the state and that a single standard be used for financial eligibility. *Id.* § 1396n(c)(3) (referring to 42 U.S.C. §§ 1396a(a)(1), (a)(10)(C)(i)(III)). As with other Medicaid programs, the source of these funds includes a mix of federal and state dollars.

Such waiver plans are aimed at promoting "cost-effectiveness and efficiency." *Id.* § 1396n(b). To ensure those goals, a state must certify that the average per-person cost of providing home and community care through the waiver program does not exceed the average cost of providing that care

---

[1] Courtney Phillips was Commissioner when the suit was litigated in district court and when the appeal was filed.

No. 19-10874

in an institution. *Id.* § 1396n(c)(2)(D). Texas's waiver program thus provides home- and community-based care only if the annual cost of care is less than approximately $170,000. 40 Tex. Admin. Code § 9.155(a)(3) (2016).

To cover expenses that would surpass the limit in the waiver plan, HHSC may use general state revenues. If HHSC chooses not to use those funds for a patient whose cost of home care exceeds the cap, institutionalization is the only remaining option for government-funded care. Indeed, one of the prerequisites for using general revenue for home care is a determination that "there is no other available living arrangement in which the person's health and safety can be protected at that time, as evidenced by: (i) an assessment conducted by clinical staff of the commission; and (ii) supporting documentation, including the person's medical and service records." General Appropriations Act, 85th Leg., R.S., art. II, § 23(b).

In April 2018, Harrison's worsening health required additional care that exceeded the cap in the waiver program. Her primary care physician concluded that she faces a substantial risk of death if a nurse does not attend to her constantly. Harrison proposed a plan that included around-the-clock nursing care at an annual cost of approximately $330,000—well in excess of the $170,000 cap for the community-based service program. To make up the difference, Harrison requested that the HHSC use general revenue funds. The agency denied Harrison's request, concluding that her needs could be met in a state facility based on the opinion of a doctor who reviewed Harrison's medical records and visited her. But HHSC approved Harrison for eight hours of daily nurse care in the community care center where she has been residing since 2017.

No. 19-10874

Harrison's guardian sought administrative review.[2]  The Medicaid hearing officer decided that Harrison was ineligible to receive the home- and community-based service program funds because the cost of her proposed plan exceeded the $170,000 cap.  The parties, though, had not disputed that cost issue.  Harrison had asked the officer to review HHSC's refusal to dip into the general revenues.  The agency argued that there is no administrative review of that discretionary decision.  The hearing officer was silent on the disputed issue, not addressing HHSC's refusal to use general revenue.

Harrison's guardian then brought this suit, alleging that  the HHSC Commissioner discriminated against Harrison because of her disability, violating the Americans with Disabilities Act and the Rehabilitation Act.  The complaint also asserts a section 1983 claim alleging that depriving Harrison of the general revenue funds without a hearing violates due process.  The plaintiff asked the district court to enter a preliminary injunction ordering the Commissioner to maintain 24/7 nurse care until a Medicaid fair-hearing officer resolves whether HHSC should use general revenue funds to pay for her community care and whether her care complies with the ADA.

The district court issued the requested injunction.  The Commissioner appeals.

II

We first address whether the district court had jurisdiction.  The Eleventh Amendment generally bars private individuals from suing states in federal court.[3]  *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363

---

[2] Harrison's guardian had filed a federal suit in 2018 that was soon dismissed after HHSC agreed to provide 24-hour nurse care pending the administrative hearing.

[3] That sovereign immunity can, however, be waived or abrogated.  In a footnote in her brief, Harrison argues that Texas waived sovereign immunity for suits under section 504 of the Rehabilitation Act, one of the two disability-discrimination statutes at issue here.

(2001).  There is, however, an important exception when a plaintiff seeks injunctive relief to enjoin ongoing violations of federal law.  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–56 (2011); *Ex parte Young*, 209 U.S 123, 156 (1908).  A state official violating federal law can be sued for prospective relief.  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Does *Ex parte Young* allow this suit being brought against another state official named Young?  The general dividing line is between impermissible suits seeking remedies for past violations of federal law and permissible suits seeking prospective relief to prevent ongoing violations.  A request for injunctive relief does not automatically put a suit on the *Ex parte Young* side of the line.  The key is not the type of relief sought but whether the remedy is preventing ongoing violations of federal law as opposed to past ones. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974) (contrasting the permissible prospective relief granted in *Young* with the impermissible retrospective relief sought in *Edelman*).  A state employee fired because of her disability could not obtain an award of "equitable restitution" requiring the state official to pay her for lost wages.  *Id.* at 668 (concluding that such a remedy is "in practical effect indistinguishable in many aspects from an award of damages against the State"); *see also Garrett*, 531 U.S. at 374 (holding that the Eleventh Amendment bars suits for damages under Title I of the ADA).  But such an employee could sue the state seeking reinstatement.  *See Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008) ("[R]einstatement

---

*See Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 352 (5th Cir. 2005) (en banc) (holding that a state waives sovereign immunity from claims arising under section 504 by accepting the relevant federal financial assistance).  The Commissioner responds that Harrison did not raise this argument in district court.  We need not decide whether Harrison forfeited this argument given our conclusion that the suit seeks prospective relief under *Ex parte Young.*

[is] an acceptable form of prospective relief that may be sought through *Ex parte Young*").

A prospective remedy like reinstatement will, of course, have some effect on the state treasury. The reinstated worker will have to be paid going forward. But that impact on the fisc does not take the suit outside *Young*'s ambit. *Ex parte Young* itself had an "effect on the States's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions." *Edelman*, 415 U.S. at 667. Much bigger drains on state funds resulted from a number of Supreme Court cases, brought under *Young*, that required future payment of welfare benefits. *Id.* (citing *Graham v. Richardson*, 403 U.S. 365 (1971); *Goldberg v. Kelly*, 397 U.S. 254 (1970)); *see also Milliken v. Bradley*, 433 U.S. 267, 288–90 (1977) (holding that the Eleventh Amendment did not bar an injunction to eliminate a segregated school system and share ongoing educational costs among defendants). Closer to home, we allowed a suit for injunctive relief against a previous HHSC Commissioner for allegedly denying access to the same Medicaid program at issue here. *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 414 (5th Cir. 2004). These cases show that even when substantial sums are at stake, "an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*." *Edelman*, 415 U.S. at 668.

It follows that despite its potential impact on the Texas treasury, Harrison's suit is properly brought under *Young* because it seeks only prospective relief to remedy ongoing violations of law. That Harrison seeks only forward-looking relief distinguishes this suit from cases like *Edelman* and *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459 (1945), in which the injunctions against state officials required payments to compensate for past violations of the law. In *Edelman*, sovereign immunity barred a district court

from ordering states to compensate federal-aid applicants whose applications were processed too slowly before the injunction issued.  415 U.S. at 668.  In *Ford Motor*, sovereign immunity barred a district court from ordering a state to return taxes it previously collected in violation of federal law.  323 U.S. at 460–62; *see also Turnage v. Britton*, 29 F.4th 232, 239–40 (5th Cir. 2022) (holding that sovereign immunity barred suit against state officials seeking interest for refund payments based on unlawful utility rate increase).  By contrast, any costs Texas would incur if Harrison were to succeed would be based on her future needs.  In fact, there is not even possibility of retrospective relief as up to now Harrison has received all the Medicaid care she has sought.

The Commissioner also misses the mark in arguing that *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), bars this suit. *Pennhurst* emphasizes another requirement for *Ex parte Young*: the plaintiff must be seeking to prevent an ongoing violation of a *federal* law.  *Id.* at 106. Suits to enjoin violations of state law do not get around sovereign immunity. *Id.*  Harrison's claims, however, arise under federal law—the Rehabilitation Act, the Americans with Disabilities Act, and the Due Process Clause of the 14th Amendment.  Federal jurisdiction thus does not offend *Pennhurst*.  *See, e.g.*, *Jordan v. Fisher*, 823 F.3d 805, 809–10 (5th Cir. 2016) (holding that sovereign immunity and *Pennhurst* do not bar a section 1983 lawsuit alleging that failure to adhere to state law violated federal due process); *Raj v. La. State Univ.*, 714 F.3d 322, 327–29 (5th Cir. 2013) (holding that sovereign immunity and *Pennhurst* barred only state law claims when a defendant brought both federal and state causes of action seeking the same relief).

Sovereign immunity does not bar this suit.  There is federal jurisdiction.

## III

We thus review the injunction.  For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest.  *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017).  We review the district court's grant of Harrison's preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo.  *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018).

## A

In addressing the plaintiff's likelihood of prevailing, we first consider whether she is likely to overcome the Commissioner's argument that the district court should abstain from exercising jurisdiction.

District courts have discretion to abstain from deciding unclear questions of state law arising in complex state administrative schemes when federal court intervention would undermine uniform treatment of local issues.  *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 362 (1989) (*NOPSI*); *Burford v. Sun Oil Co.*, 319 U.S. 315, 332 (1943).  But this "*Burford* abstention is disfavored as an abdication of federal jurisdiction."  *Aransas Proj. v. Shaw*, 775 F.3d 641, 653 (5th Cir. 2014); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (recognizing that federal courts have a "virtually unflagging obligation" to exercise the jurisdiction Congress gives them).  In deciding whether to abstain under *Burford*, district courts consider: (1) whether the plaintiff raises state or federal claims, (2) whether the case involves unsettled state law or detailed local facts, (3) the importance of the state's interest in

the litigation, (4) the state's need for a coherent policy in the area, and (5) whether there is a special state forum for judicial review. *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 313 (5th Cir. 2021).

The first factor counsels against abstention as Harrison raises only federal claims (under the ADA, the Rehabilitation Act, and section 1983).

The second factor likewise supports the court's excercising its jurisdiction. The case does not require a federal court to resolve unsettled state law or apply detailed facts related to local conditions. The state statutory scheme seems clear, as our due process analysis below demonstrates. Evaluating Harrison's claims requires applying federal law to her circumstances, an exercise of judicial authority well within the expertise of federal courts. *See Romano v. Greenstein*, 721 F.3d 373, 380 (5th Cir. 2013) (declining to abstain when Medicaid beneficiary alleged her benefits were terminated in violation of the federal Medicaid Act and Due Process Clause of the 14th Amendment).

The third factor does point towards abstention. Texas has a strong interest in deciding how it allocates state funds. That is somewhat offset by the countervailing federal interest in combating disability discrimination. *Cf. Aransas Proj.*, 775 F.3d at 650–51 (balancing state and federal interests in Endangered Species Act context). Plus, Medicaid is a program of cooperative federalism that involves the expenditure of both state and federal funds. Although this factor still favors abstention, "[t]he weight" it receives depends on the next factor, "which focuses on the potential for federal disruption of a coherent state policy." *Grace Ranch*, 989 F.3d at 316.

Whether a lawsuit might cause a complex state administration "to crumble" is the "fundamental *Burford* concern." *Id.* at 319; *see also NOPSI*, 491 U.S. at 362 (reasoning that *Burford* abstention is primarily concerned with preventing federal court rulings from disrupting the uniform application

of state policy). This lawsuit by a single Medicaid recipient does not risk "recurring and confusing federal intervention in an ongoing state scheme." *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 315 (5th Cir. 1993). Although ordering Young to provide services to Harrison would reduce funds available for other state priorities, Young cites no case holding that merely ordering the expenditure of state funds represents the federal court interference with an "interdependent" administrative scheme that *Burford* seeks to prevent. *Grace Ranch*, 989 F.3d at 317. To the contrary, we have rejected abstention in another suit seeking an order to provide Medicaid services. *Romano*, 721 F.3d at 380.

The final factor also counsels against abstention as Texas does not have a special forum for judicial review of Medicaid determinations.

With the scorecard lopsided in favor of exercising jurisdiction, it is unlikely the district court abused its discretion in declining to abstain. *See Grace Ranch*, 989 F.3d at 319 (holding that abstention was not warranted even when the first three factors favored abstention).

B

Although Harrison has shown that the district court should hear her claims, we conclude she is unlikely to succeed on one of them: her due process claim.

States cannot "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The preliminary question is whether Harrison has a property interest in receiving Texas general revenue to pay for 24/7 nursing care.

We have a hard time seeing such a property right. Individuals have a constitutionally protected property interest in social welfare benefits when a statute entitles them to the benefits if they satisfy eligibility criteria. *See Bd.*

*of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Social Security disability benefits are an example of such a property interest.  *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Goldberg v. Kelly*, 397 U.S. 254, 261–62 (1970) (recognizing property interest in state welfare payments when statute entitles a recipient to them).  Such a property interest likely exists for Texas's Medicaid "waiver" program that provides home- and community-based care.  Those who satisfy the criteria for that program have a "legitimate claim of entitlement" to participate.  *Roth*, 408 U.S. at 577.  But Harrison concedes she no longer qualifies for that program as her medical needs now far exceed the spending cap.

Given her concession that she no longer qualifies under the waiver program, no statute promises Harrison the home care she is seeking.  *Id.* (explaining that a "claim of entitlement" to benefits must be "grounded in the statute defining eligibility for them").  Texas law says HHSC is "authorized" to use general funds for home-care services in certain situations but does not require the agency to do so or otherwise guarantee such benefits to Medicaid beneficiaries.  Without "mandatory language" requiring the payment of benefits, a claimant has no property interest in the requested funds.  *Ridgely v. FEMA*, 512 F.3d 727, 736 (5th Cir. 2008) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989)) (finding it unlikely that applicants for FEMA rental assistance had a property interest in those benefits because neither statutes nor regulations contained "'explicitly mandatory language' that *entitles* an individual to receive benefits if he satisfies that criteria").  A "benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  HHSC appears to have that discretion in deciding whether to use general revenue for home- or community-care services that exceed the cap in Texas's Medicaid waiver plan.

Because it is unlikely that Harrison has a property interest in the treatment she is seeking, a preliminary injunction was not warranted on her due process claim. *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 589 (5th Cir. 2015) (noting importance of the "likelihood of success" factor in holding that preliminary injunction was not warranted based on plaintiff's failure to meet this first factor).

C

That leaves the Rehabilitation Act and ADA claims as the only potential source for the injunction.

"Unjustified isolation" of disabled individuals in institutions rather than community placement is unlawful discrimination under the ADA and the Rehabilitation Act. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). That requirement is rooted in an ADA regulation providing that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d), *quoted in Olmstead*, 527 U.S. at 592.

The difficulty is determining when institutionalization is "unjustified." States accordingly must treat disabled individuals in community settings if: (1) treatment professionals determine such placement is appropriate, (2) the individual does not oppose the placement, and (3) the placement can be reasonably accommodated, taking into account state resources and the needs of other disabled individuals. *Olmstead*, 527 U.S. at 607.

In addressing plaintiff's likelihood of prevailing, the district court recognized conflicting evidence on whether 24-hour nursing care was necessary but "afford[ed] more weight to the opinion of Harrison's doctors." We do not see clear error in that credibility determination. And

the second requirement—Harrison's desire to remain at the community care center with nursing care—was not contested.

That leaves the third requirement: the reasonable accommodation inquiry that is the crux of an ADA claim. The district court concluded that plaintiff is likely to show the 24/7 nursing care is a reasonable accommodation because she provided a cost estimate showing that the alternative of institutionalization would be slightly more expensive. ($333,204.85 for institutionalization versus $327,923.10 for community-based care with a nurse always present). But *Olmstead* warned against "so simple" a focus on just the marginal costs of the plaintiff's treatment. *Id.* at 604 (explaining that such a limited focus "overlooks costs the State cannot avoid; most notably, a 'State . . . may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions'" (omission in original) (quoting Brief for United States as *Amicus Curiae* at 21, *Olmstead*, 527 U.S. 581)). Determining whether an *Olmstead* accommodation is reasonable requires "taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* at 607.

Although we recognize that the Commissioner did not offer its own evidence of costs at this early stage in the case, we nonetheless conclude that the narrow, marginal cost comparison the district court relied on—one that just barely showed institutionalization to be more costly—is not sufficient to determine that plaintiff is likely to succeed on her disability-discrimination claims. That is especially so when the plaintiff cites no case, nor could we find one, holding that *Olmstead* requires community-care services that would exceed the federally approved cost cap on a Medicaid program that provides an alternative to institutionalization. In fact, other courts have rejected *Olmstead* claims that would exceed similar caps on Medicaid programs. *See, e.g.*, *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 620–22 (9th Cir. 2005)

No. 19-10874

(rejecting ADA class action that sought expansion of the cap on the number of enrollees in Medicaid waiver plan because the existence of the plan showed the state's commitment to deinstitutionalization).   And the cost cap of roughly $170,000 in Texas's Medicaid waiver plan is itself some evidence of the relevant costs as federal law allows approval of waiver plans only if "the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made . . . for such individuals if the waiver had not been granted."   42 U.S.C. § 1396n(c)(2)(D).

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'"   *PCI Transp., Inc. v. Fort Worth & W.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (quotation omitted).  On the current record, plaintiff has not shown that she can prevail on an *Olmstead* claim seeking services that exceed the cost cap in Texas's Medicaid waiver program.

\*        \*        \*

We VACATE the preliminary injunction and REMAND for further proceedings.

Edith H. Jones, *Circuit Judge*, concurring:

I concur in the opinion and decision to remand but am skeptical, not only because no court has yet issued an individual treatment plan in this setting, but for several additional reasons, that the plaintiff has slender likelihood of prevailing on remand. First, the extent to which *Olmstead* remains definitive is unclear to me in light of the 2008 amendments to the ADA. Second, Justice Kennedy's concurrence in *Olmstead*, which furnished the fifth vote for the Supreme Court's judgment, emphasizes that (a) whether "isolation" is justified includes considerations such as the fact that the ADA does not require individual treatment plans, *Olmstead*, 527 U.S. at 613–14, 119 S. Ct. at 2193, and (b) federalism costs inherent in federal court decrees concerning state-managed programs must be taken seriously, *id.* at 610, 2192. Third, the extent to which the plaintiff is a qualified individual under ADA, that is, a person who would actually benefit from her community placement as opposed to institutionalization, is disputed on this record and, indeed, may have changed since the preliminary injunction hearing. These second and third points reinforce that *Olmstead*'s reasoning does not boil down to a mere comparative cost analysis in this case.