# United States Court of Appeals for the Fifth Circuit

_____

United States Court of Appeals
Fifth Circuit

**FILED**
June 6, 2024

Lyle W. Cayce
Clerk

No. 23-10223

_____

Barbara Harrison, by her next friend and guardian, Marguerite Harrison,

*Plaintiff—Appellant*,

*versus*

Cecile Erwin Young, *in her official capacity as the Executive Commissioner, Texas Health and Human Services Commission*,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-1116

_____

Before Clement, Southwick, and Ho, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

For nearly five years, Barbara Harrison has been challenging the Texas Health and Human Services Commission's ("HHSC") decision denying funding for medical services that she claims are necessary for her survival. The district court granted summary judgment to HHSC, in part on mootness grounds. But we find that the district court's mootness determination was erroneous and that the factual record is still not sufficiently developed to support a judgment as to Harrison's discrimination claims. We therefore

No. 23-10223

REVERSE in part, AFFIRM in part, and REMAND, once again, for further proceedings.

I.

Harrison suffers from severe physical and intellectual disabilities. She cannot walk or talk, and she is fed through a tube in her stomach. Because of these conditions, Harrison needs intensive medical care.

Beginning in February 2017, Harrison lived in a group home where she received nursing services funded by HHSC's program for providing home- and community-based care to people with disabilities who would otherwise require institutionalization (the "Program"). The Program receives federal funding through Medicaid. *See* 42 U.S.C. § 1396n. As a condition of receiving federal funding, HHSC must certify that the average per-person cost of providing home- and community-based care through the Program is less than or equal to the average cost of providing that care in an institution (*i.e.*, a nursing home). 42 U.S.C. § 1396n(c)(2)(D). Texas law therefore provides that an individual is only eligible for the Program if the expected cost of that person's care does not exceed certain limits (the "Cost Cap"). 26 TEX. ADMIN. CODE § 263.101(a)(3). In situations where an applicant's expected medical need exceeds the Cost Cap, Texas has allocated state "general revenue" funds that may be used to pay for services above the Cost Cap if the relevant state officials determine that the individual meets certain statutory criteria. 40 TEX. ADMIN. CODE § 40.1.

In April 2018, Harrison's treating physician determined that her condition had deteriorated to the point where she required 24/7 one-on-one nursing care. However, after reviewing her application, HHSC determined that the cost of providing Harrison's necessary level of care exceeded the Cost Cap. Separately, HHSC also found that Harrison did not meet the criteria to qualify for "general revenue" funds to cover the difference.

2

No. 23-10223

Harrison was therefore denied Program-funded nursing services, meaning her only option for receiving government-funded medical care was to move to an institutional setting.

In May 2019, Harrison challenged HHSC's determination in court, arguing that HHSC (1) discriminated against Harrison because of her disability, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, by denying her Program-funded nursing services, and (2) violated her due process rights by denying her request for general revenue funds without a hearing. The district court granted a preliminary injunction requiring HHSC to fund 24/7 one-on-one care for Harrison until she received a hearing on her request for general revenue funds. Three years later—in August 2022—our court vacated the preliminary injunction and remanded for further proceedings, holding that Harrison was unlikely to succeed on her due process claim and had not demonstrated a likelihood of success on the ADA/Rehabilitation Act claims. *Harrison v. Young*, 48 F.4th 331, 339–43 (5th Cir. 2022).

After the case was remanded to the district court, Harrison submitted a new application to HHSC for 24-hour nursing care under the Program (new applications are required annually), the cost of which again exceeded the Cost Cap. Rather than reject her application outright, HHSC determined that Harrison did not require 24-hour nursing care and that 5.5 hours of nursing care per day would be sufficient to meet her medical needs. HHSC therefore approved Harrison for $128,203.70 in Program funding, well below the Cost Cap. The district court found that Harrison's change in status— from receiving *no* Program funding to receiving *some* Program funding— mooted Harrison's ADA/Rehabilitation Act claims. The court therefore dismissed them and then granted summary judgment to HHSC on Harrison's due process claim. Harrison now appeals.

II.

We review the district court's grant of summary judgment *de novo* and apply the same standards as the district court. *Huskey v. Jones*, 45 F.4th 827, 830 (5th Cir. 2022). "Summary judgment is appropriate if the record evidence 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(a)). We view all facts and inferences in the light most favorable to the nonmoving party. *Id.* "We may also affirm on any ground supported by the record, including one not reached by the district court." *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012).

III.

A.

We begin with Harrison's discrimination claims. The ADA and Rehabilitation Act prohibit HHSC from discriminating against a "qualified individual with a disability" on account of that disability when administering the Program. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). And "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited by these statutes. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599–600 (1999).

Harrison claims that she faces imminent unjustified institutionalization and is therefore being unlawfully discriminated against under *Olmstead*. But the district court determined that because Harrison was now re-enrolled in the Program—albeit with only 5.5 hours of nursing care per day—she "no longer face[d] institutional isolation" and therefore her claims were moot. The parties agree that the district court erred in this determination. And they are correct. Harrison's argument is, and has always been, that she cannot survive if she receives less than 24/7 one-on-one nursing care. But the Program funding she received is not enough to cover

that level of care. Therefore, Harrison still has a live claim that she is at imminent risk of being forced into an institution. And because the district court could still effectuate relief through a favorable ruling requiring HHSC to approve Harrison's requested level of care under the Program, her claims are not moot. *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (cleaned up)).

Despite conceding that Harrison's discrimination claims are not moot, HHSC urges this court to affirm the district court's dismissal on three alternative bases: (1) Harrison was not "qualified" for the Program; (2) Harrison was not discriminated against based on her disability; and (3) Harrison's request cannot be reasonably accommodated. We address each contention in turn.

1.

A "qualified individual with a disability" means an individual who, "with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). HHSC argues that Harrison is not a "qualified" individual that is protected by the ADA because her requested treatment exceeds the Cost Cap and is "not the kind of services the [Program] was designed to provide." But solely relying on whether the cost of an individual's care exceeds the Cost Cap to determine that a disabled person is unqualified for the Program ignores the "reasonable modification" command in the statute. Indeed, if the sole basis for being unqualified were exceeding the Cost Cap, then the "reasonable modification" requirement would be meaningless. *See Steimel v. Wernert*, 823 F.3d 902, 916 (7th Cir. 2016).

No. 23-10223

With respect to the types of services offered, HHSC argues that the Program does not provide the "twenty-four-hour monitoring by a medical professional" Harrison seeks. But HHSC does not appear to really contend that the *type* of service Harrison requests is not offered by the Program. To the contrary, HHSC *approved* Harrison's request for one-on-one nursing care. Instead, HHSC's issue concerns the *amount* of services Harrison requested, *i.e.*, the number of hours of one-on-one nursing care per day. But this goes towards the question of "reasonable modification," not whether Harrison is otherwise "qualified" in the first place.

2.

HHSC's second argument is that the 2008 amendments to the ADA changed the meaning of "discrimination" under the statute, casting doubt on *Olmstead*'s continuing validity. Specifically, HHSC says that the *Olmstead* opinion "borrowed [the] definition [of discrimination] from Title I" of the ADA because Title II did not specifically define the term. *See Olmstead*, 527 U.S. at 622 (Thomas, J., dissenting). And because the ADA Amendment Act of 2008 changed the definition of "discrimination" in Title I to "track the language of the ban on discrimination in Title VII of the Civil Rights Act," HHSC reasons that *Olmstead*'s definition of discrimination is no longer good law. Instead, HHSC urges that we use the "ordinary" or "traditional" meaning of discrimination, which "requires only 'evenhanded treatment in relation to non-handicapped individuals.'" *See Traynor v. Turnage*, 485 U.S. 535, 548 (1988).

There are several problems with HHSC's argument. First, the *Olmstead* decision did not rely on the definition of discrimination in Title I. Instead, it drew from the congressional findings provisions of the ADA, which "appli[ed] to the entire statute" and "explicitly identified

6

'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Olmstead*, 527 U.S. at 600 (quoting 42 U.S.C. § 12101(a)(2), (5)).

Second, the 2008 amendments do not require a "traditional" meaning for the term "discrimination" as HHSC suggests. HHSC draws meaning from the fact that the 2008 amendments changed Title I's discrimination provision from "[n]o covered entity shall discriminate against a qualified individual *with a disability because of the disability of such individual*," 42 U.S.C. § 12112(a) (2006) (emphasis added), to "[n]o covered entity shall discriminate against a qualified individual *on the basis of disability*," § 12112(a) (2012) (emphasis added); Pub. L. No. 110-325, § 5, 122 Stat. 3553, 3557. We do not share HHSC's view. The portion of Title I that Justice Thomas asserted was "substantially import[ed]" into *Olmstead*'s Title II definition remained unchanged. *See Olmstead*, 527 U.S. at 622 (Thomas, J., dissenting). *Compare* § 12112(b)(1) (2006), *with* § 12112(b)(1) (2012) (both prohibiting "limiting, *segregating*, or classifying" persons with disabilities adversely (emphasis added)). Thus, even assuming that *Olmstead* used the definition of discrimination in Title I, the 2008 amendments would not require a different understanding of discrimination under Title II.

Third, the 2008 amendments overturned Supreme Court precedent on what constitutes a disability, not what constitutes discrimination. *See* Pub. L. No. 110-325, § 2(b), 122 Stat. at 3553 (discussing *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002)). In *Sutton*, the Court held that courts must consider ameliorative effects of treatment when determining whether a person is "substantially limited" in major life activity to be considered "disabled." 527 U.S. at 482. In *Toyota Motor*, the Court extended its *Sutton* reasoning to hold that the statutory definition of "disability" "need[s] to be interpreted strictly to create a demanding standard for qualifying as disabled." 534 U.S. at 197. This went too far for Congress, so it passed the 2008 amendments to "reject" the

Supreme Court's conclusions, "reinstat[e] a broad scope of protection to be available under the ADA," and convey that the issue of whether a person is disabled under the ADA "should not demand extensive analysis." Pub. L. No. 110-325, § 2(b), 122 Stat. at 3553–54. It would be counterintuitive for Congress to have broadened the interpretation of the term "disability" and expanded ADA coverage while simultaneously limiting the scope of the "discrimination" prohibited by Title II. *See Neely v. PSEG Tex., LP*, 735 F.3d 242, 245–46 (5th Cir. 2013).

Fourth, HHSC cites a passage from the congressional record stating that the 2008 amendments were intended to "mirror the structure of [the] nondiscrimination protection provision in Title VII of the Civil Rights Act of 1964." 154 Cong. Rec. S8840, S8843 (Sept. 16, 2008). But that passage proceeds to explain that the salient result of the amendment to Section 12112(b) is that it "ensures that the emphasis in questions of disability discrimination is properly on the critical inquiry of whether a qualified person has been discriminated against on the basis of disability, and not unduly focused on the preliminary question of whether a particular person is a 'person with a disability.'" *Id.* Thus, even assuming that we are willing to consider the legislative history, it supports the interpretation that the 2008 amendments were intended to reduce scrutiny over whether an individual is disabled, not change the inquiry into whether discrimination occurred.

Fifth, and finally, our court has applied or relied on *Olmstead* in varying contexts, albeit without addressing the argument HHSC raises here, repeatedly since the 2008 amendments—including in this case. *See, e.g.*, *United States v. Mississippi*, 82 F.4th 387, 392–401 (5th Cir. 2023); *Harrison*, 48 F.4th at 341–42; *Caldwell v. KHOU-TV*, 850 F.3d 237, 243–44 (5th Cir. 2017). And we see no good reason to deviate from that path here. *See In re AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023) (explaining that a court's prior decisions, including on "issues decided by 'necessary implication,'"

"should continue to govern the same issues in subsequent stages of the same case" (citations omitted)). Indeed, HHSC has cited no case, from any circuit, adopting its proposed interpretation. *Olmstead* therefore remains good law and we must abide by it. *See Ballew*, 668 F.3d at 782.

3.

To determine whether Harrison was discriminated against by way of imminent unjustifiable institutional isolation in violation of the ADA and Rehabilitation Act, we analyze whether (1) "treatment professionals have determined that community placement is appropriate" for Harrison, (2) Harrison desires (or does not oppose) community-based treatment; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 587. Only the first and third prongs are at issue.

With respect to the first prong, the parties' dispute centers around the question of *which* treatment professionals' determination controls. *Olmstead* focused on the determination of "the State's treatment professionals." *Id.* And HHSC argues that *Olmstead* means exactly what it says—the opinion of the *State's* treatment professionals governs, and here HHSC's treatment professionals concluded that Harrison could be appropriately treated in a community-based setting with only 5.5 hours per day of nursing care. Harrison disagrees. She contends that the Court in *Olmstead* deferred to the "State's treatment professionals" only because the plaintiffs there were already institutionalized and therefore being *treated by* the State. So, Harrison argues, the court must defer to the opinions of the professionals who are "actually treating the plaintiff[] at issue"—here, Harrison's own physicians.

In its preliminary injunction order, the district court considered the various medical opinions proffered by the parties and found that "the opinion

of Harrison's own doctors should carry more weight . . . than that of HHSC's professionals." We found no error in that approach. *Harrison*, 48 F.4th at 342. Today, the parties continue to present conflicting medical opinions as to Harrison's necessary level of care. And since there has been no additional factual development towards resolving that issue, we see no grounds for granting summary judgment on this basis at this juncture. *See Crabb v. Comm'r*, 136 F.2d 501, 502 (5th Cir. 1943) ("[T]he record as supplemented on the new hearing fails to bring anything to light which would warrant our departing from the law of the case as it was settled in the former opinion.").

The dispositive question is thus, assuming Harrison's request for 24-hour, one-on-one nursing care is medically necessary, can this level of care be "reasonably accommodated" by the Program? But the factual record in this case is simply not sufficiently developed to provide an answer. As we previously explained, "[d]etermining whether an *Olmstead* accommodation is reasonable" is a fact-intensive inquiry requiring more than just a "marginal cost comparison" between community-based care and institutionalization. *Harrison*, 48 F.4th at 342. For example, the district court must "tak[e] into account the resources available to the State and the needs of others with . . . disabilities." *Id.* (quoting *Olmstead*, 527 U.S. at 607). But there is no evidence in the record that it has done so.

The bottom line is that many important factual questions concerning Harrison's appropriate level of medical care and whether such care can be reasonably accommodated by the Program remain unanswered. For example:

- Where is Harrison now? Harrison's counsel represented during oral argument that she was moved to a new group home in April 2023, but that information is not in the record, nor do we know *why* she was moved.

- What level of care is Harrison currently receiving? Harrison's counsel said at oral argument that she has one nurse and three non-

nurse staff members providing her with 24-hour care. But again, that is not in the record.

- Has Harrison's current level of care been sufficient to keep her alive and healthy? Harrison's counsel told us at oral argument that she has been hospitalized at least once in the time period since our previous opinion in this case, but again this is outside the scope of the record.

- Is HHSC using its entire annual budget for home- and community-based care under the Program or is there a surplus? Case law suggests that it may not be possible to reasonably accommodate a plaintiff's request when the state's home- and community-based care program is already "operating at capacity." *Arc of Washington State Inc. v. Braddock*, 427 F.3d 615, 620 (9th Cir. 2005).

- Can any Texas institution actually provide 24-hour, one-on-one nursing care? Case law suggests that a relevant inquiry is "whether a nursing home facility actually could meet [the plaintiff]'s medical needs." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 610 (7th Cir. 2004).

These questions, and others, should be explored by the district court in the first instance on remand.

## B.

Finally, we address Harrison's due process claim. Medicaid-funded State medical-assistance plans are required to provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." 42 U.S.C. § 1396a(a)(3). Harrison claims that, by denying without a hearing her request for state "general revenue" funds to cover the cost of care exceeding the Cost Cap, HHSC violated her statutory due process rights. But Texas' "general revenue" funds are *not* funded by Medicaid. Rather, they are funds allocated by the State legislature to cover expenses for Texas citizens over-and-above the

Cost Cap of the State's Medicaid-funded Program. So, the requirements of § 1396a(a)(3) do not apply.

To be sure, there is a direct link between "[t]he general revenue funding [Harrison] seeks" and "the Medicaid funding provided under the [Program]," in that, absent an alternative accommodation, Harrison will not receive her requested care under the Program if she is denied general revenue funds to cover the amount exceeding the Cost Cap. But "a state may give additional medical assistance under its own legislation, independent of federal reimbursement" under Medicaid. *Lankford v. Sherman*, 451 F.3d 496, 506 (8th Cir. 2006). That is precisely the situation here. Texas has allocated its own "general revenue" to "pay for services above the [Cost Cap]" when "federal financial participation is not available." 40 Tex. Admin. Code § 40.1(b). In other words, State general revenue funds are only available when federal Medicaid funds are not. And the State's funding decisions under this independent program are not subject to Medicaid's "fair hearing" requirement. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981) (suggesting that state program was not bound by federal requirements where it received no federal funding).

## IV.

For these reasons, we AFFIRM the district court's grant of summary judgment to HHSC on Harrison's due process claim but REVERSE the district court's dismissal of Harrison's discrimination claims and REMAND for further factfinding and proceedings.